# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

JULIE M. BENNETT,

                                     Plaintiff,          DECISION AND ORDER

           -vs-

VERIZON WIRELESS,                       04-CV-6314 CJS

                                 Defendant.

## APPEARANCES

For Plaintiff:                    Jason Little, Esq.
                                  Law Office of Christina Agola, Esq.
                                  730 First Federal Plaza
                                  28 East Main Street
                                  Rochester, NY 14614
                                  (585) 262-3320

For Defendant:                Robert C. Weissflach, Esq.
                                  Harter Secrest and Emery LLP
                                  Twelve Fountain Plaza
                                  Suite 400
                                  Buffalo, NY 14202-2293
                                  (716) 845-4207

**Siragusa, J.** Before the Court is defendant Verizon Wireless' ("Verizon") motion for reconsideration (Docket No. 41) of the Court's Decision and Order (Docket No. 40) denying summary judgment for Verizon. For the reasons stated below, the Court grants Verizon's motion for reconsideration, and upon reconsideration, grants Verizon's motion for summary judgment. The Clerk is directed to enter judgment for Verizon.

**BACKGROUND**

The Court's prior decision fully discussed the facts, and familiarity with them will be presumed. Verizon argues in its reconsideration motion that the Court erroneously relied on the affidavit of Lucy Couvertier to conclude that plaintiff Julie M. Bennett ("Bennett") had raised a material question with regard to whether Verizon's purported reason for dismissing Bennett was a pretext. Specifically, Verizon focuses on the Court's determination that the Couvertier affidavit showed it was a "common practice" for supervisors at Verizon to permit their employees to access the supervisor's family's and friends' accounts and make changes to them. (Couvertier Aff. ¶ 8, Docket No. 33, at 10.) Verizon argues that Bennett made no showing that any supervisor, other than the unnamed one mentioned by Couvertier, gave a subordinate this permission, or that Couvertier's supervisor was similarly situated to Bennett, or that Couvertier's supervisor did not have permission from *her* supervisor to access her family's and friend's accounts, or that Couvertier's supervisor's conduct was known to the decision-makers who fired Bennett. (Def.'s Mem. of Law in Support of Mot. to Reconsider, Docket No. 43, at 5.) Bennett responds with 15 reasons why a material issue of fact precludes summary judgment, one of which is based on Couvertier's allegations. In response, Verizon points to its reply to the summary judgment response in which they discussed why each of the 15 reasons was insufficient to preclude summary judgment.

**STANDARD OF REVIEW**

An interlocutory judgment, such as the Court's September 19, 2007, Decision and Order denying summary judgment, "is subject to revision at any time before the entry of [final] judgment." Fed. R. Civ. P. 54(b) A party seeking reconsideration must set "forth

concisely the matters or controlling decisions which counsel believes the court has overlooked." *Id*.  Thus, upon a motion to reconsider a "district court has the discretion to reconsider, and if appropriate, revise an interlocutory order." *Kliszak v. Pyramid Mgmt. Group.*, No. 96-CV-0041E(Sc), 1998 U.S. Dist. LEXIS 7588, 1998 WL 268839, *1 (W.D.N.Y. Apr. 30, 1998) (citing *Partmar Corp. v. Paramount Corp.*, 347 U.S. 89, 100, 98 L. Ed. 532, 74 S. Ct. 414 (1954)); *see also Virgin Atlantic Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (district court has broad discretion to revise an interlocutory order, noting "need to correct a clear error" as a major ground justifying reconsideration). While a district court has broad discretion to grant reconsideration, parties should not be allowed simply to reargue their case, or present new facts and issues that they failed to argue in the first instance. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *Lehmuller v. Incorporated Village of Sag Harbor*, 982 F. Supp. 132, 135 (E.D.N.Y. 1997).

## ANALYSIS

First, the Court adheres to its original determination that Bennett put forth a *prima facie* case, and that Verizon articulated a legitimate, non-discriminatory reason for Bennett's discharge. At oral argument on the motion to reconsider, the Court focused on one issue raised by Verizon:  the Court's reliance on Couvertier's affidavit. In that regard, Verizon argues that Bennett attempted to show through Couvertier's affidavit that two supervisors (Couvertier's and Bennett, who was a supervisor herself) were similarly situated, and that despite the similarities, Couvertier's supervisor was not dismissed, but

Bennett was. Verizon relies on the Second Circuit's decision in *Graham v. Long Island R.R.*, 230 F.3d 34, 39-44 (2d Cir. 2000). In that case, the court wrote that,

> When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, we have said that the plaintiff must show she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself.

*Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). The Court went on to articulate what was meant by the phrase, "all material respects," holding that, "the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*, at 40 (citation omitted). The specific factual situation in *Graham* is instructive on this point. There, the appellate court wrote:

> Beyond his bare assertion, Graham offers no proof that LIRR gave last chance waivers automatically for first time drug and alcohol offenders as a matter of policy or custom. Instead, the only evidence he offers is that one white employee, Carl DiPersia, tested positive for cocaine use in 1987 and received a last chance waiver after his first violation without having to file a grievance. Such isolated evidence is insufficient to make a showing that LIRR maintained a policy or custom.

> In addition, the chief trial and investigative officer in Graham's department, Ralph J. Domenici,  denied that such a policy was in effect during his tenure in the department between 1985 and 1991.

*Id.*, at 41. This factual scenario parallels Bennett's in that her supervisor, Gulliford (the one who actually terminated her) also denied it was a common practice for supervisors to unilaterally authorize their subordinates to make changes to the supervisor's family's and

friends' accounts. (Gulliford Decl. ¶ 40, Docket No. 18, at 11.)[1] Bennett's memorandum of

law in opposition lists 15 reasons, only one of which touches on this point. At number 11

she states, "[t]he undisputed fact [is] that subordinate employees routinely accessed their

supervisor's account with the supervisor's permission as per Verizon Policy without

reprimand." (Pl.'s Mem. of Law, Docket No. 45, at 4.)

In order to determine whether Couvertier's affidavit supports Bennett's contention,

the Court must carefully parse the specific language to determine whether it is evidentiary

proof in admissible form of disparate treatment. Specifically, Couvertier stated, in pertinent

part:

> Indeed, I had routinely made changes to not only my family['s] and friends'
> accounts with the prior approval of my supervisor, but to the accounts of my
> supervisor's family and friends' accounts, all with prior approval by that same
> supervisor, and that this was common practice. I was only terminated when
> I accessed my family member's account without prior approval.

(Couvertier Aff. ¶¶ 8-9, Docket No. 33, Ex. B.) Couvertier's statement does not specify the

"this" which she claims was common practice, but it appears to be that she believed it

common practice to access her supervisor's family's and friends' accounts with her

supervisor's permission. What is unsaid, is whether Couvertier's supervisor, like Bennett,

did not have permission from a supervisor in her own chain of command to grant

Couvertier permission to access the accounts. In that regard, Couvertier acknowledged

that Verizon's Business Code of Conduct contained this provision:

---

[1] While I was Director of the Verizon Wireless Call Center in Rochester, New York, I did
not become aware of any other circumstance where a supervisor allowed or instructed one of
her subordinates to access and/or make changes to that supervisor's account. If I had been
aware of any such activity, it would be investigated as a violation of the Code of Business
Conduct, and appropriate disciplinary action would be taken if such activity were substantiated."

> Our legal and Company requirements governing privacy require that you **do not**: …
>
> Access your personal wireless account information or those of family or friends, without prior approval by your supervisor. Access includes, issuing credits/adjustments, altering account information or making payments or equipment changes.

(*Id*. (emphasis in original).) On reconsideration, the Court concludes, therefore, that Couvertier's affidavit does not support Bennett's argument that a similarly-situated employee was treated more favorably. Consequently, again upon reconsideration, the Court determines that based upon the Couvertier affidavit alone, a material issue of fact that would preclude summary judgment does not exist, and the Court must, therefore, discuss the matters raised in the original summary judgment motion that were not addressed in the initial decision.

In her response to the reconsideration motion, Bennett presents fifteen reasons for why this Court should find a material issue of fact precluding summary judgment. The Court will addresses each one in turn.

### *Temporal proximity between Bennett's complaints and her termination*

On November 17, 2003, six days after Bennett complained to her supervisor, Gulliford, on November 14, 2003, Gulliford recommended her termination. Six days after the November 14 meeting, Savino and Gulliford informed Bennett she was terminated for month end reviews ("MORs") and issues regarding her cell phone account. Bennett argues that this sequence of events represents a strong temporal proximity between her protected act, and the alleged retaliation. Her argument finds some support in *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 180 (2d Cir. 2005), which relied on *Quinn v. Green Tree Credit Corp*., 159 F.3d 759, 770 (2d Cir. 1998). However, *Jute* overlooked the factors

considered by the court in *Quinn*. In *Quinn*, the Second Circuit relied not only on the strong temporal proximity between the employee's protected conduct and the adverse employment action, but also the following: "[n]early all of the record evidence supporting the Company's asserted non-retaliatory reason for discharge both was generated by two of Quinn's alleged harassers—Fahey and Harwood—and followed her initial inquiry with the DHR regarding sexual harassment." In contrast to that situation, here the evidence supporting Verizon's non-retaliatory reason for discharging Bennett was generated before Bennett complained to Gulliford and is not disputed by Bennett. Indeed, later in her memorandum of law, Bennett argues that directing a subordinate to access her account was *not* a violation of Verizon's Business Code of Conduct. (Pl.'s Mem. of Law, Docket No. 36) at 16.) Moreover, neither the *Jute* panel nor the panel in *Quinn* addressed the specific question presented here: is temporal proximity alone enough to show that the defendant's non-retaliatory reason was pretextual? Another Second Circuit panel[2] addressed this very issue in a summary order, citing to *Quinn*:

> While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir.1998) (holding that a strong temporal connection between the plaintiff's complaint and other circumstantial evidence is sufficient to raise an issue with respect to pretext).

*Simpson v. New York State Dept. of Civil Services*, 166 Fed. Appx. 499, 502 (2d Cir. Jan 9, 2006). Since the decision in *Simpson* is not precedential, *see* U.S. Court of Appeals, Second Circuit, Rules § 0.23(b), the Court also relies on the reasoning in decisions of two

---

[2]The Honorable Thomas J. Meskill was on the panel that decided *Quinn* as well as the panel for the decision in *Simpson*.

other circuits, which the Court finds persuasive on this point. *See Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309 (6th Cir. 2001) ("temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397-98 (10th Cir. 1997) (disagreeing with the plaintiff's argument that temporal proximity between protected activity and adverse employment action is always sufficient to survive summary judgment).

Viewing the evidence in the light most favorable to Bennett, the Court determines that there is an insufficient basis for a trier of fact to doubt the persuasiveness of the Verizon's proffered evidence and ultimately to find that the reasons offered by them for Bennett's dismissal were pretextual.

### *Gulliford never recommended termination prior to November 17, 2003 and Bennett maintained a stellar personnel record*

The next two arguments (Nos. 2 & 3) Bennett makes are that Gulliford did not recommend terminating her until three days after she complained to him about two of her team members, and that, while employed at Verizon, she maintained a stellar performance record with no disciplinary issues and with regular promotions. Bennett seems to contend, therefore, that the reason for termination proffered by Gulliford must be pretextual. (Pl.'s Mem. of Law (Docket No. 36) at 13.)

In this regard, Gulliford testified at his deposition in response to Bennett's counsel's questions as follows:

> Q. Since July of 1999 through November 2003, the question is did you ever have any opportunity in that time period to recommend her termination?
>
> A. I did recommend termination in November of 2003.

Q. Let me make it more clear. Prior to November 2003, going back to her start date of July of 1999, did you ever have any prior occasion to recommend her termination?

A. No.

(Gulliford Dep., Docket No. 20, Ex. C, at 65.) Clearly, Gulliford stated that he had no reason to recommend Bennett's termination prior to learning of her violation of the Business Code of Conduct. During her deposition, Bennett testified about this issue in response to questioning by Verizon's counsel:

Now, by having your subordinate employees make changes to your personal consumer account, weren't you condoning a violation of the Code of Business Conduct?

A. Which I had stated before when I had spoken with Mr. Gulliford the changes that I felt were made were not significant enough nor were they against what their normal job duties were, due to the fact that I could have made that exact same call in and had those changes made by that representative who made those changes or a number of other ones that work in the Rochester area.

(Bennett Dep., Docket No. 20, Ex. B, at 69.) Thus, Bennett's argument appears to be that Gulliford's decision to fire her for a violation of the Business Code of Conduct was unwise in light of Bennett's stellar prior record and the *de minimis* nature of her violation of the Code of Business Conduct. However, unless the termination is based on a reason the law forbids, its wisdom is not for the Court to judge. *See Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982) (federal discrimination statutes "do[] not authorize the courts to judge the wisdom of a corporation's business decisions"); *see also Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921 (7th Cir. 2001) ("When an employer articulates a reason for discharging the plaintiff not forbidden by law it is not our province to decide whether the reason is wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.");

*Sharp*, 232 F.Supp.2d at 1380 ("Nor does [Title VII] require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Ellis v. Provident Life & Accident Ins. Co.*, 926 F. Supp. 417, 419 (S.D.N.Y. 1994). The Court, consequently, disagrees that these arguments create an issue of fact as to whether Gulliford's proffered reason for Bennett's termination was pretextual and that discrimination or retaliation was the real reason.

### Similarly-situated employees

Bennett raises in her next arguments (Nos. 4 & 5), that several other Verizon supervisors, who had not engaged in protected activity, were only given a written warning for violating the Business Code of Conduct, whereas Bennett was terminated. (Pl.'s Mem. of Law, at 7.) Verizon contests that any of the comparators Bennett discusses were similarly situated in all material respects. *Graham*, 230 F.3d at 39.

Bennett first raises the situation of Tammy Norton, a supervisor. She was demoted on November 2, 2003, to the position of lead coordinator after an October 31, 2003, audit of her work performance revealed that she failed to complete MORs[3] for the prior three months. Bennett then raises the situation of another supervisor, Vicki Field, who was also demoted to a lead coordinator position on November 12, 2003. Field's work was also subject to an October 31, 2003, audit which determined that her MORs were incomplete, inaccurate and never delivered to her team members. In contrast, Bennett states that her MORs were accurate, complete and timely prepared, yet she was terminated, while the

---

[3]Neither party explains what this abbreviation means.

other two supervisors were merely demoted. (Pl.'s Mem. of Law, at 8-9.)

As discussed above, with respect to Couvertier's supervisor, the comparators must be similarly situated in all respects with Bennett in order to be of legal value to her argument that she was treated differently and, hence, illegally. Both of these two supervisors Bennett discusses were found to have had performance issues. Verizon's Code of Business Conduct does not address poor performance as a basis for termination, whereas it does specifically address the conduct Bennett was found to have undertaken.[4] The Code of Business Conduct states, in its conclusion, that

> Violations of the law, Our Code, and other Company policies, procedures, instructions, practices and the like can lead to disciplinary action up to and including termination from employment. Such disciplinary action may also be taken against supervisors or executives who condone, permit or have knowledge of illegal, unethical or other improper conduct and do not take appropriate action.

(Our Code of Business Conduct, Docket No. 20, Ex. E, at 24.) The two supervisors to whom Bennett compares herself are not similarly situated in all material respects. *Graham*, 230 F.3d at 39. That they were given warnings, and not terminated, does not show that Bennett was the victim of disparate treatment.

Bennett also raises the situation of two other employees at Verizon and asks the Court to compare their situations with her own. One is Diana Moller who received a written warning on October 31, 2003, and the other, Katrina McKay, was placed on a final warning on March 8, 2005. Bennett and her supervisor, Savino, addressed the written warning to Moller as a result of Moller's having sent inappropriate emails to a teammate  on two

---

[4] The Court is aware that Bennett contends the Code did not prohibit what she did, through a subordinate, and will address that argument below.

occasions which they described as "pointing to a continuing pattern of abuse of the company e-mail system." (Written Warning Code of Conduct, Docket No. 32, Part 3, at 38.) Neither Moller nor McKay was a supervisor and, in fact, both reported to Bennett. Furthermore, McKay's situation took place years after Bennett's termination. The Court is not persuaded that either employee was similarly situated in all material respects to Bennett. As a supervisor, Bennett instructed her employees to do what the Verizon policy prohibited them, and her, from doing directly—accessing her own accounts, or those of her family or friends. The consequence for doing so was no more severe than that suffered by fellow employee Lucy Munoz, also not a supervisor, who accessed her family member's account and was terminated as a result. (Gulliford Decl., Docket No. 18  ¶ 41).

### *Investigation of Bennett's cellular telephone account*

Bennett's sixth argument against summary judgment is that until November 12, 2003, at 2:09 p.m., there had been no investigation of her cellular account; thus, she concludes, any investigation was undertaken in retaliation for her engaging in a protected activity. (Pl.'s Mem. of Law, Docket No. 45, at 10.) In contrast to Bennett's assertion, Gulliford stated in his declaration that it was on or about October 31, 2003, that the associate director of customer service, Darryl Hunt, advised Gulliford of "questionable activities on Ms. Bennett's cellular account." (Gulliford Decl., Docket No. 18  ¶ 28). Evidently, the close scrutiny came as a result of Bennett's fiancé's call to Verizon about Bennett's account and charges for text messaging. The fiancé was David Munoz, a former Verizon employee himself, and brother of Lucy Munoz, then a Verizon employee.  David Munoz was the family member whose account Lucy Munoz accessed, conduct which resulted in her termination from Verizon. David Munoz was an authorized user on Bennett's

account and his angry call to Verizon about the text messaging charges resulted in his call being referred to Hunt. While investigating the text messaging issue on the account, Hunt discovered questionable activities and informed Gulliford about them. (Gulliford Dep., Docket No. 20-05, at 71.) David Munoz's initial October 31, 2003, call to Verizon is documented in Verizon's Exhibit L, Docket No. 20-14. Also contained in Exhibit L are email messages between Hunt and Gulliford, the earliest of which is a message from Hunt dated November 12, 2003, at 6:33 p.m., addressed to Gulliford, beginning, "Buddy, Just a brief summary FYI. There were no inappropriate credits on Julie's account." (*Id.*, at 13.) The evidentiary proof before the Court does not show that Verizon's investigation began subsequent to Bennett's protected activity. Therefore, the Court determines that Plaintiff has failed to raise a material issue of fact on this point.

### *Verizon's representations to the EEOC regarding its investigation of Bennett's cellular telephone account*

Bennett argues in her seventh point that Verizon's claim that it started investigating Bennett's account prior to her protected activity is a recent fabrication. (Pl.'s Mem. of Law (Docket No. 36) at 14.) She claims that she first met with Gulliford on November 7, 2003, and that the events Hunt investigated had "mostly occurred months prior to November 2003." (*Id.*) She concludes that "Verizon has failed to proffer a reasonable explanation as to why Bennett was not disciplined earlier for these actions." (*Id.*) Further, Bennett claims that Verizon misrepresented the facts to the EEOC.

First, Verizon's letter to the EEOC stated, *inter alia*:

Mr. Gulliford met with Ms. Bennett on two different occasions during the first week of November to better understand how she had been handling the delivery of the MOR's [sic]. During their first meeting, Ms. Bennett denied

trying to obtain signatures from her representatives in this fashion, but during their second meeting, she changed her story and acknowledged that she had in fact obtained several signatures from her employees on October 31st, after Mr. Gulliford's e-mail was distributed. [footnote omitted]

At or around this same time, Mr. Darryl Hunt, Associate Director—Customer Service, advised Mr. Gulliford of questionable activities on Ms. Bennett's consumer cellular account. The events leading up to the discovery were as follows. On or about October 31, 2003, Mr. David Munoz, the authorized user on Ms. Bennett's consumer cellular account and a former Verizon Wireless employee, called in to the Customer Service Call Center to complain about additional text messaging fees which he incurred. Mr. Munoz was extremely upset during the call. As a result, Mr. Munoz's call was escalated.

(Verizon EEOC submission (Mar. 8, 2003), at 3, Ex. G to Pl.'s Local Rule 56.1 submission,

Docket No. 32-01, at 38.) Bennett's time line indicates that it was not until November 9 that

she discussed the issue forming the basis for her complaint to EEOC with her supervisor,

Pat Savino:

Diana Moller also came to me with a concern that she was advised that Katrina was questioning Diana's sexuality and that she knew that she was the one that started the rumor about us going to Canada and having a sexual affair. She said that she was upset, because her sexuality is being questioned and then it was passed onto me. I told her that I would discuss it with Pat, as it was upsetting to me. Diana said that she does not feel as though it was anyone's business.

11/9- I called Pat on my ride home to advise of what had happened that day.

(Timeline, Docket No. 20, Ex. J, at 4.) Thus, the evidentiary proof on the pending motion

shows that Verizon's investigation of Bennett's cellular telephone account occurred prior

to the date on which she informed management of the facts forming the basis of her EEOC

complaint. The proof does not raise a material issue of fact, and in support of her

contention that the investigation of her account, which formed the basis for her ultimate

termination, resulted from her complaint about sexual harassment or a hostile work

environment.

***Verizon's Business Code of Conduct***

In her eighth argument against summary judgment, Bennett contends that Verizon's Business Code of Conduct does not prohibit her from authorizing subordinates to make changes to her own cellular telephone account, or those of her friends. (Pl.'s Mem. of Law (Docket No. 36) at 21.) Bennett's argument is, essentially, that although the Code prohibits an individual employee from accessing his own account, it does not prohibit access directed by a supervisor. The Court is convinced by the evidentiary proof submitted on the motion that the Code prohibits *any* employee from accessing his or her account, or directing another employee to do so, unless authorized by the account-holder's supervisor. During her deposition, Bennett testified about this issue in response to questioning by Verizon's counsel:

> Now, by having your subordinate employees make changes to your personal consumer account, weren't you condoning a violation of the Code of Business Conduct?
>
> A. Which I had stated before when I had spoken with Mr. Gulliford *the changes that I felt were made were not significant enough* nor were they against what their normal job duties were, due to the fact that I could have made that exact same call in and had those changes made by that representative who made those changes or a number of other ones that work in the Rochester area.

(Bennett Dep., Docket No. 20, Ex. B, at 69 (emphasis added).) Even Bennett does not dispute that she violated the Code of Business Conduct when she directed subordinates to do what she herself was not authorized to do, but argued simply that the violation was insignificant. The argument that it was not a violation if she had a subordinate do what she could not, is not persuasive. Bennett merely acted through agents to access her own account. Thus, the subordinates who accessed her account at her direction were not

violating the Business Code of Conduct, but in directing her subordinates to do so, Bennett was, herself, violating that provision. Had Bennett's supervisor authorized her to access her own account, she could have directed a subordinate to do so without violating the Code.

### No inappropriate credits on Bennett's account

Bennett's ninth argument against summary judgment consists of the following: "There were no inappropriate credits located on Bennett's account. (Vol. II, Ex. GG)." (Pl.'s Mem. of Law (Docket No. 36) at 21-22.) Bennett's argument overlooks that in his report to Gulliford, Hunt not only stated there were no inappropriate credits, but stated further, "(With the exception of the recently applied SMS credits, which have been removed)." (Vol. II, Ex. GG, Docket No. 32-4.) Nevertheless, Verizon's Business Code of Conduct (*quoted above at 5*) did not prohibit inappropriate credits, it prohibited all "access" to one's personal account, or those of family of friends. Thus, as the brevity of Bennett's argument suggests, the fact that there remained no inappropriate credits on Bennett's account is of no consequence to Verizon's motion.

### Largest credit card payment on Bennett's account

Bennett's tenth argument against summary judgment is that the highest credit card payment on her account was not entered by a subordinate, but by Bennett herself, using the self-help system available to any customer of Verizon. (Pl.'s Mem. of Law (Docket No. 36) at 22.) By this argument, Bennett does not dispute that her subordinates accessed her account contrary to Verizon's Business Code of Conduct. As with Bennett's ninth argument, this fact is inconsequential to the pending motion.

***Bennett acted through agents***

Bennett's eleventh argument is a variation of her eighth argument, discussed above (at 13). Essentially, she contends that she did not violate Verizon's Business Code of Conduct because she herself did not access her account—her subordinates did and with her permission. This illogical argument has been addressed by the Court and rejected. Bennett is not claiming that her subordinates acted without her authority. Thus, the acts of her subordinates are imputed to her. *C.f. In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) ("Under New York law, the adverse interest exception rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal."). Bennett's argument requires a strained, illogical reading of the Business Code of Conduct, which Verizon has conclusively shown prohibits access to one's account, either by onself, or by directing one's subordinate to act on one's behalf.

***The greeting card***

Bennett's thirteenth argument against summary judgment is that, following her termination, Gulliford discovered a Valentine's Day card in Bennett's desk with a letter signed "D" and concluded that Bennett and Moller had an intimate relationship. (Pl's Mem. of Law (Docket No. 36) at 23-24; Letter and card, Ex. FF, Docket No. 32-4.) She also refers to a December 9, 2003, email by Gulliford, in which he wrote the following:

> Julie expressed her concern with Katrina McKay and did not agree with a decision her Associate Director made regarding an approach to correct and warn about call avoidance. Julie felt this employee was "getting away with murder" and "should be disciplined more". Our concern with doing anything other than coaching the entire team on expectations was the fact that two confirmed friends of Julie that reported to her, Diana and Amy, used to be friends with Katrina.

Also, within two days Diana requested a meeting with me to discuss rumors that she heard Katrina was spreading about an intimate relationship between her and Julie, and Julie met with me to discuss her concern with not doing more with "this troublemaker" - referring to Katrina. Diana informed me that Amy provided her with the information regarding the rumor, and Julie informed me that she was in fact friends with both Diana and Amy – who were no longer friends with Katrina. You can see now where we were very careful not to take immediate steps regarding Julie's concern and approach to this representative when we knew there were personal relationships, *confirmed intimate relationships* based on the letters we found in Julie's office after her termination, and too much gossip and bickering between team members.

We will continue to keep an eye on Katrina to ensure she is abiding by guidelines and not avoiding calls.

(Gulliford email to Nancy Percent (Dec. 9, 2003, 10:09 p.m.), Ex. JJ, Docket No. 32-4

(emphasis added).) Bennett then relates that at his deposition, Gulliford was asked the

following questions and gave the following answers:

Q. And was it your impression that they did []⁵ have an intimate relationship with one another?

A. Intimate, I don't know. Was it my impression?

Q. Right.

A. They had a friendship. I don't know what the relationship was.

(Guilliford Dep., Docket No. 30-1, at 24.) Apparently, Bennett is arguing that Gulliford's

misstatement in the email, "we knew there were personal relationships, confirmed intimate

relationships based on the letters we found in Julie's office after her termination," if it was

a misstatement, or in his deposition testimony, if the email was correct, shows that

---

[5]In her memorandum of law (Docket No. 36) at 14, Bennett's counsel cites to "Vol. I, Ex C, p. 24, Lies [sic] 15-20" as the source for her quotation. However, in the memorandum of law, Bennett's counsel added the word "not" at this location, whereas in the transcript, Exhibit C, the word "not" does not appear.

Verizon's reason for terminating her was a pretext and that discrimination was the true reason. Bennett's stated claim against Verizon was retaliation, not a hostile work environment. (Pl.s Mem. of Law (Docket No. 36) at 2.) Thus, Verizon's failure to investigate her complaint about rumors circulating in the work place do not establish that Verizon's stated reason for Bennett's termination was a pretext. Further, Gulliford learned in his meeting with Moller on November 12, 2003, about rumors being spread by Katrina McKay that an intimate relationship existed between Bennett and Moller. (Gulliford Decl. (Docket No. 18) ¶ 35.) Gulliford informed the human resources department the same evening about the issue. (*Id*. ¶ 36.) When he met with Bennett, Gulliford raised the issue with her and, according to Gulliford,

> Ms. Bennett did not appear to take the issue very seriously and, in fact, seemed to find the topic somewhat amusing. Ms. Bennett informed me that the rumors regarding a relationship between the two had been circulating since July, that Mr. Munoz, Ms. Bennett's fiancé, was also aware of the rumors, and that they had both just laughed about it.

(Gulliford Dep. (Docket No. 20, Ex. C) ¶ 37.) Bennett claims that the Valentine's Day card and letter were given to Verizon's counsel, citing to Pat Savino's deposition testimony, at pages 56 and 71. Her testimony at those cited pages indicates that the usual policy upon cleaning out a supervisor's office was to send to that supervisor personal property found, but Savino did not know whether the card and letter were sent back to Bennett, or what became of them. In any event, if they were retained by Verizon, it most likely would have been in contemplation of a hostile work environment claim. Since Bennett specifically states in her memorandum of law that she is not bringing such a claim, this information is irrelevant to the issue before the Court, since it has already determined that Bennett was engaged in protected activity in its prior decision.

***No further investigation by Verizon***

Bennett's fourteenth reason for denying summary judgment is that following Bennett's termination, Verizon never completed an investigation of her complaint about a hostile work environment. (Pl.'s Mem. of Law (Docket No. 36) at 25.) Bennett contends that Verizon's policy required Gulliford to report the issue to the human resources department and that Verizon misrepresented itself on this point to the EEOC. Once again, however, Bennett's complaint is retaliatory discharge, not hostile work environment. (*See*, Pl.s Mem. of Law(Docket No. 36) at 2.)

Since Verizon proffered a non-discriminatory reason for her discharge, Bennett is afforded an opportunity to demonstrate that Verizon's proffered reason was pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). She must show that Verizon's proffered reason is not credible, and show that an unlawful discriminatory intent motivated Verizon's actions. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Evidence of how Gulliford handled Moller's and Bennett's complaints about what one of Bennett's subordinates was doing does not show that a discriminatory reason likely motivated Gulliford to fire Bennett, or that his proffered explanation is unworthy of credence. That the investigation did not progress is logically explained by Bennett's attitude about the report of McKay's rumor-spreading, and the fact that both individuals had left Verizon within days of Gulliford first learning of the problem. Contrary to Bennett's contention, the Court determines that the lack of any further investigation does not support

the conclusion that Verizon fired her in retribution for engaging in a protected act.

***McKay never disciplined***

In her fifteenth reason why summary judgment should not be granted to Verizon, Bennett argues that since McKay was never disciplined, "a jury could reasonably have found that the plaintiff had satisfied her burden of proving that the defendant's proffered reasons for firing her (violating the Code of Conduct) were pretextual." (Pl.'s Mem. of Law (Docket No. 36) at 16.) McKay was the individual whom Moller accused of spreading rumors about a close, intimate relationship between Moller and Bennett. As with the previous argument, the Court does not find a material issue of fact precludes summary judgment, or that the lack of discipline for McKay undermines the non-discriminatory reason proffered by Verizon.

## CONCLUSION

Although the Court has previously found that Bennett met the *de minimus* requirement of showing she engaged in a protected activity, and that she was terminated in close temporal proximity to that activity, it also found that Verizon articulated a legitimate, non-discriminatory reason for Bennett's discharge. Having granted the motion to reconsider, the Court now reverses its prior decision (Docket No. 40) that a material issue of fact precluded summary judgment. Instead, having reviewed again the papers submitted on the original motion, and the papers submitted in connection with Verizon's motion to reconsider and Bennett's opposition thereto, the Court concludes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-vits…show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c) (2007). Accordingly,

Verizon's motion for summary judgment is granted and the Clerk is directed to enter

judgment in Verizon's favor.

IT IS SO ORDERED.

DATED:      January 23, 2008
            Rochester, New York

                    ENTER.


                    /s/ Charles J. Siragusa
                    CHARLES J. SIRAGUSA
                    United Stated District Court